**STATE of Maine**

v.

**Robert A. CURTIS, Jr.**

Supreme Judicial Court of Maine.

April 5, 1979.

Michael D. Seitzinger (orally), Asst. Atty. Gen., Augusta, for plaintiff.

Steven C. Fletcher (orally), Rockland, for defendant.

Before McKUSICK, C. J., and WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

McKUSICK, Chief Justice.

Defendant Robert A. Curtis, Jr., has appealed from his convictions in Knox County for burglary[1] and theft[2] (Class B) on two separate occasions, one at the home of Ralph Copeland in Friendship on January 4, 1977, and the other at the home of Arthur Swanson in Cushing nine days later. The first pair of indictments was tried before the Superior Court without a jury, and the second, with a jury. At both trials the prosecution relied heavily upon confessions allegedly made by the 19-year-old defend-

---

1. In violation of 17–A M.R.S.A. § 401 (Supp. 1976).

2. In violation of 17–A M.R.S.A. § 353 (Supp. 1976).

ant at the Thomaston State Police Barracks on May 16, 1977, the day of his arrest. Following return of indictments for both sets of crimes, the Superior Court determined him to be indigent and appointed counsel to represent him at public expense. On October 26, 1977, a Superior Court justice, after hearing extensive testimony, denied defendant's motion to suppress the confessions for use as evidence at trial. Defense counsel then made timely and repeated attempts to obtain a court order for preparation at public expense of a transcript of the suppression hearing, asserting that the transcript was necessary in aid of his defense at trial and of an appeal from any conviction. All those attempts were unsuccessful, and as a result, defense counsel did not have such a transcript available for use at the trials held in January and March 1978. These appeals were first argued orally before this court at its December 1978 term, and immediately thereafter this court ordered the testimony of the suppression hearing transcribed. Following receipt of the transcript and further briefing and oral argument at the March 1979 term, we are now faced with the question whether denial of a free transcript of the suppression hearing resulted in such prejudice to defendant at trial that his convictions must be reversed. We do find reversible error and accordingly sustain defendant's appeals.

■ The State now concedes that it was error for defendant to be denied his request for a free suppression hearing transcript. The State, however, contends that the error nonetheless was harmless so that an appellate court should not reverse defendant's convictions.

Recognizing that the ability to pay for the costs of transcript preparation "bears no rational relationship to a defendant's guilt or innocence," *Griffin v. Illinois*, 351 U.S. 12, 17–18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956), the United States Supreme Court has held that the equal protection clause of the 14th amendment prohibits the interposition of a financial wall between an indigent defendant and his right to main-

tain an effective defense of the charges against him. "There can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal." *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971). The duty of providing an indigent defendant with a free transcript is, the Law Court has said, one of "the constitutional requirements which the State must affirmatively effectuate to equalize the conditions between the poor and the rich in our adversary system of jurisprudence either at the trial level or on appeal." *See Harrington v. Harrington*, Me., 269 A.2d 310, 314 (1970).

Thus, denial of the suppression hearing transcript was an error. In order to determine whether the error even so was a harmless one not affecting the convictions appealed from, we must examine in detail the factual circumstances under which the police officers obtained the confessions.

On May 10, 1977, Ronald Sawyer, defendant's brother-in-law, gave a statement to Town Constable Mineau of Friendship implicating defendant in one of the criminal incidents that are the subject of these appeals. Armed with this statement, Mineau obtained an arrest warrant for defendant on May 12. Four days later, defendant voluntarily presented himself at the Waldoboro Police Station, where he was arrested at about 1:45 p. m. by State Police Trooper Lyons. Curtis was then handcuffed and driven by Trooper Lyons to the State Police Barracks in Thomaston, arriving there about 2:00 p. m.

Two different versions of what subsequently transpired at the State Police Barracks have been presented. The officers testified that defendant voluntarily decided to confess to the Swanson and Copeland burglaries and to another unrelated crime and that during a period of time extending from 3:00 p. m. until after 10:00 p. m., the officers prepared three written confessions for Curtis to sign. The officers further state that Curtis signed the confessions after reading them and that Curtis was well

aware of what he was doing. On the other hand, Curtis asserts that he never confessed and that he has consistently denied that he was involved in the crimes. Curtis further claims that after seven hours of questioning, during which he says he was under the influence of beer and marijuana he had consumed prior to his arrest, he complied with the officers' request that he sign "release papers," which he later discovered were actually confessions.

■ In two key respects, the suppression transcript shows discrepancies between the testimony given by the officers at that pretrial hearing and their testimony at trial. If the requested transcript had been available to defense counsel at the time of trial, he might on his cross-examination of the officers have made significant use of those inconsistencies.[3]

In the first place, the suppression hearing transcript reveals discrepancies in Trooper Lyons' testimony as to why he took defendant to the State Police Barracks, rather than directly to Rockland for his initial appearance in the District Court. At both trials, Lyons testified that when he left the Waldoboro Police Station with defendant in his custody early in the afternoon of May 16, 1977, he was planning to follow his normal procedure and take defendant to the Knox County sheriff's office in Rockland, where sheriff's office personnel would arrange for taking defendant before a District Court judge. Lyons said he departed from that routine only because defendant asked Lyons if he could talk with Constable Mineau before going to court. Defendant denied that he ever made such a request to see Constable Mineau.

On this point the transcript of the suppression hearing shows that Lyons' testimony there differed from his later testimony at trial. At that pre-trial hearing, Trooper Lyons testified that he took Curtis to the State Police Barracks for "processing" and that it was not until after their arrival at the barracks that Curtis asked if he could

talk to Constable Mineau. If defense counsel at trial had had the suppression hearing transcript, he could during cross-examination have exposed this apparent conflict in Trooper Lyons' testimony.

In the second place, the suppression hearing transcript might have been valuable to defense counsel in cross-examining Constable Mineau. At the first trial in January 1978 Mineau testified that he made only one promise to defendant: "I said there was just one thing I could do for him, if he wanted to cooperate, that I would state to the court that he had cooperated, but that was the extent of what I could do at this particular time." At the second trial, however, Mineau testified, for the first time, that he had engaged in sentence recommendation bargaining with the District Attorney. Mineau then testified that, aware of the fact that Curtis was afraid of going to state prison because he feared he would be the victim of homosexual attacks by other prisoners, he telephoned the District Attorney from the State Police Barracks and induced the District Attorney to promise Curtis that the State "would do everything possible to keep him [Curtis] out of the state prison  .  .  .  ."

Surprised by this testimony concerning the District Attorney's promised sentencing recommendation, defense counsel asked Constable Mineau why he had never mentioned this topic before. Mineau responded that he had never been asked before. Defense counsel countered with the question: "Haven't you testified before that you told [Curtis] that if he signed the [confessions] it wouldn't help him and it wouldn't hurt him?" With some equivocation, Mineau denied having made such a statement. The suppression hearing transcript reveals, however, that on at least three occasions during that pre-trial hearing Mineau testified that he told Curtis "that he had nothing to gain and nothing to lose by making a statement except I would tell the Court that he cooperated if he wanted to make a statement

---

3. In addition to possible impeachment value, prior inconsistent statements made by the officers at the suppression hearing would have been admissible as substantive evidence under Rule 801(d)(1), M.R.Evid.

and that's all I could promise him . . ." If defense counsel had been able to expose this apparent conflict in Mineau's testimony, the inconsistency might have affected the factfinders' appraisal of Mineau's testimony on the voluntariness of the confessions.

 Although the Superior Court justice hearing the suppression motion had ruled that the confessions were admissible, the circumstances of the confession-taking remained an issue at trial. The factfinders on the ultimate issue of guilt or innocence had the task of deciding how much weight to accord the confessions, and all the evidence of the confession-taking circumstances presented at the suppression hearing on the admissibility question was properly admissible before the ultimate factfinders as bearing on the weight question.[4] Even though a confession is admitted at trial, the defendant can rightfully "appeal to the jury to exclude [the confession] from consideration as improperly obtained, and can show all the circumstances tending to destroy or weaken its probative power." *State v. Collins*, Me., 297 A.2d 620, 632 (1972), quoting *State v. Grover*, 96 Me. 363, 366, 52 A. 757, 759 (1902).

The constitutional error committed below of denying defense counsel a pre-trial transcript prevented him from exercising one of the principal tools of the trial lawyer in testing the testimony of adverse witnesses, namely, impeachment through prior inconsistent statements.[5] A nonindigent defendant would not have suffered under any such disability. For the error committed in casting that disability upon this indigent defendant to be harmless, this appellate court must be satisfied beyond a reasonable doubt that exposure at trial of the inconsistencies in the officers' testimony would have had no effect upon the factfinders' determination of guilt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In other words, to find the error harmless, we must say that beyond a reasonable doubt the convictions in the Superior Court trials would have been unchanged. That we cannot say.

Accordingly, the entry must be:

Appeals sustained.

Judgments of conviction set aside.

Remanded for further proceedings consistent with the opinion herein.

POMEROY and NICHOLS, JJ., did not sit.

---

4. In addition, on the ground that the conflicts in the officers' testimony constituted new evidence not previously available to defendant, defense counsel might have persuaded the trial justices to reexamine the pre-trial ruling denying defendant's motion to suppress the alleged confessions. *State v. Inman*, Me., 350 A.2d 582, 595 (1976); *State v. Hazelton*, Me., 330 A.2d 919, 921 (1975).

5. *See State v. Nelson*, Me., 399 A.2d 1327, 1329 n. 3 (1979).